**Mary Jo Hadler NARUM, Plaintiff,**

v.

**ELI LILLY AND COMPANY, Defendant.**

**Civ. No. 3–94–1185.**

United States District Court,
D. Minnesota,
Third Division.

Jan. 26, 1996.

**318**

Charles Selcer Zimmerman, Robert Randall Hopper, Hart Lawrence Robinovitch, Zimmerman & Reed, Minneapolis, MN, for plaintiff Mary Jo Hadler Narum.

Joseph Michael Price, Gretchen S. Gates, Faegre & Benson, Minneapolis, MN, Timothy A. Pratt, Mark C. Hegarty, David W. Brooks, Shook Hardy & Bacon, Kansas City, MO, for defendant Eli Lilly & Company.

### MEMORANDUM AND ORDER

MAGNUSON, Chief Judge.

This matter is before the Court upon the various motions of Eli Lilly and Company. Eli Lilly moves the Court to strike the Affidavit of Linda Borer and the Affidavit of Plaintiff Mary Jo Hadler Narum, as well as to grant summary judgment in Eli Lilly's favor.

### BACKGROUND

According to Ms. Narum, in 1956 or 1957 Narum's mother, while she was pregnant with Narum, ingested a drug that was manufactured and sold by Eli Lilly. The drug was "diethylstilbestrol" (DES). In 1975 Narum became aware that her mother had ingested DES and she obtained literature concerning DES. Narum learned from the literature that, because of her exposure to DES, she had an increased risk of developing cancer of the vagina or cervix, that she may have difficulties becoming pregnant or carrying a pregnancy to term, and that she might develop structural changes in her vagina and cervix. Because of the increased risk of contracting cancer, the literature warned that females who were exposed to DES should be examined regularly.

In 1980, Narum underwent a colposcopy, a diagnostic test which revealed she had no cervical or vaginal cancer. Narum became pregnant in early 1985. Dr. McCollum diagnosed Narum as having a cervical hood. Narum testified during her deposition that Dr. McCollum advised her she had the cervical hood and told her she had "classic DES exposure cervix." On March 15, 1985, Dr. McCollum noted in his medical report that Narum "does have a [history] of DES induced changes." Narum recalls being informed her cervical hood was caused by her DES exposure. In April 1985, Narum lost her baby to a miscarriage. She attributes the miscarriage to her exposure to DES.

In October 1989, Dr. McCollum referred Narum to Dr. Ahrens. Dr. Ahrens noted on Narum's record, "DES exposure," and also noted "a history of in utero DES exposure referred to by Dr. McCollum for further evaluation." Dr. Ahrens also noted in his October 1989 report that Narum's cervix "had a wide transformation zone and cervical hood as expected with DES exposure.... The most abnormal area [of the vaginal fornices] was biopsied." Narum recalls being referred to Dr. Ahrens at that time because of DES exposure and because of abnormal growths that Dr. Ahrens removed from Narum's vagina or cervix. Narum testified that Dr. Ahrens also informed her that her "cervix was typical DES."

Narum married in 1990. She and her husband attempted to conceive a child beginning in July 1991. Unsuccessful, she consulted with Dr. Ahrens. Dr. Ahrens ultimately performed a hysterosalpingography. This test revealed Narum had an abnormally shaped uterus; specifically, the uterus was "T shaped". Dr. Ahrens reported the test results to Narum April 22, 1992. Eli Lilly asserted at oral argument, without contradiction by Narum, that Narum had her abnormal, T-shaped uterus since birth. Neither Narum nor Dr. Ahrens was aware she had a T-shaped uterus until April 1992. In August 1992, a physician informed Narum her T-shaped uterus would prohibit her from having a child.

Narum filed this action on August 11, 1994. In it she accuses Eli Lilly of negligence, strict liability, breach of warranty, misrepresentation, and fraudulent concealment. In part, Narum's Complaint states:

> As a direct and proximate cause of the Defendant's negligence, strict liability[,] breach of warranty, misrepresentation, and fraudulent concealment, the Plaintiff was exposed to dosages of DES or DES-related compounds or congeners before birth which caused her to suffer infertility, to contract vaginal adenosis, and to be threatened with the development of cancerous growths and other abnormal cellular changes; to be cause to seek medical care and attention for said conditions; to suffer severe and continuing personal injury and mental anguish, and[ ] to expend monies for medical care and attention, as well as additional monies and costs [as]sorted with the adoption of children as a direct and proximate result of infertility.

Compl. ¶ 37. Eli Lilly moves the Court to grant summary judgment, arguing that all of Narum's claims are barred by the statute of limitations. The Court will discuss other facts as they become relevant.

## DISCUSSION

■ Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct.

2548, 91 L.Ed.2d 265 (1986); *Unigroup, Inc. v. O'Rourke Storage & Transfer Co.*, 980 F.2d 1217, 1219–20 (8th Cir.1992). The court determines materiality from the substantive law governing the claim. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Disputes over facts that might affect the outcome of the lawsuit according to applicable substantive law are material. *Id.* A material fact dispute is "genuine" if the evidence is sufficient to allow a reasonable jury to return a verdict for the non-moving party. *Id.* at 248–49, 106 S.Ct. at 2510–11.

■ Both parties agree to the various applicable statutes of limitations in this case, the longest of which permits six years to file a claim. Minn.Stat. § 541.05. The parties also agree that the standard that Minnesota law requires the Court to apply is found in *Hildebrandt v. Allied Corp.*; that is, two elements must be satisfied before a cause of action accrues: "(1) a cognizable physical manifestation of the disease or injury, and (2) evidence of a causal connection between the injury or disease and the defendant's product, act, or omission." 839 F.2d 396, 398 (8th Cir.1987).

Eli Lilly argues that long ago Narum became aware of various "injuries" resulting from her mother's DES ingestion, and is barred by the various statutes of limitations. In response, Narum argues that the early conditions to which Eli Lilly refers (such as the 1985 miscarriage, vaginal adenosis, threat or fear of cancer) were not "injuries" that could sustain a claim for damages, thus the limitations clock did not begin running until she learned of her T-shaped uterus in 1992. On its face, Narum's argument is plausible. However, her Complaint and her own testimony negates the argument.

■ The Complaint lists vaginal adenosis and threat of cancer development as injuries directly caused by her DES exposure, and in her deposition testimony she also includes her 1985 miscarriage, her fear of cancer and her need for frequent colposcopy exams and biopsies as injuries caused by her DES exposure. She seeks damages for all of these (except the miscarriage) in her Complaint. Thus, her argument that she had no compen-

sable injuries from DES exposure prior to being informed of her T-shaped uterus is flatly contradicted by several key facts: (1) she now in fact claims, mostly in her own Complaint, that these were injuries for which she has a right to compensation; (2) she was aware of these injuries at the time they occurred—long before being diagnosed with a T-shaped uterus; and (3) she admits that she knew at the time of these injuries (except, apparently, the miscarriage) that the DES exposure was the direct cause of each of them.

The Court turns to the injuries, claimed by Ms. Narum in her Complaint, as well as other physical manifestations that Eli Lilly argues triggered the statutory clock. Narum claims specifically that she should be compensated because she was "threatened with the development of cancerous growths and other cellular changes," which has caused her to "expend monies for medical care and attention" for it. Compl. ¶ 37. Assuming Narum states a cause of action for this "threat", she became aware of it in 1975 when she learned that her mother ingested DES while pregnant with Narum, and that her exposure to DES increased her risk of cervical or vaginal cancer. Responding to this threat, she began scheduling regular medical examinations. She had biopsies and colposcopies, the need for which she expressly attributes to her DES exposure. It is at best disingenuous for Narum to claim in her Complaint that the threat of incurring cancer along with the medical monitoring pursuant to that threat are compensable injuries for the purposes of obtaining a judgment against Eli Lilly, only now to argue that the same are not compensable injuries for the purpose of avoiding the effect of the statute of limitations. From this the Court must reject Narum's argument that she did not actually become aware of any DES related injury until she was informed of her T-shaped uterus in 1992.

Additionally, in 1985, Dr. McCollum diagnosed Narum as having a cervical hood. Dr. McCollum advised Narum of this abnormality and told her she had "classic DES exposure cervix." Narum testified her doctor told her that her cervical hood was caused by her DES exposure. On March 15, 1985, Dr. McCollum also noted Narum's "[history] of DES induced changes." Narum also attributes her 1985 miscarriage to DES exposure. The Court is not satisfied that the undisputed facts demonstrate that Narum, in 1985, knew or reasonably should have known of any causal connection between her 1985 miscarriage and her exposure to DES. However, there is no doubt that at least by March of 1985 Narum had already developed "a [history] of DES induced changes" according to her physician, that she was aware of those changes, and that she attributes them to her DES exposure.

Finally, in October 1989, Dr. McCollum referred Narum to Dr. Ahrens. Dr. Ahrens noted Narum's *in utero* DES exposure and that Narum's cervix "had a wide transformation zone and cervical hood as expected with DES exposure," and also that "[t]he most abnormal area [of the vaginal fornices] was biopsied." Narum admits she was referred to Dr. Ahrens because of DES exposure and because of abnormal growths Dr. Ahrens ultimately removed from Narum's vagina or cervix. Dr. Ahrens also informed her that her "cervix was typical DES."

■ Under Minnesota law, "A plaintiff who is aware of both her injury and the likely cause of her injury is not permitted to circumvent the statute of limitations by waiting for a more serious injury to develop." *Klempka v. G.D. Searle & Co.*, 963 F.2d 168, 170 (8th Cir.1992). In *Klempka*, the plaintiff argued that her earlier diagnosed injury was "trivial", and therefore knowledge of her later, substantial injury—which was infertility, as in this case—should mark the beginning of the statutory clock. The Eighth Circuit disagreed. It interpreted Minnesota law as requiring only "some damage" to begin the clock. *Id.* Additionally, as in this case, the plaintiff in *Klempka* actually sought recovery of damages for injuries that occurred beyond the statutory period, as well as for the later, much more serious injury of infertility.

Narum seeks to distinguish *Klempka*, arguing *Klempka* requires some "cognizable manifestation" to trigger the statutory clock. But as Eli Lilly points out, "cognizable" means "capable of being perceived or

known." *See* Random House Dictionary (Revised Edition 1982). Thus, Eli Lilly argues in essence that even if the T-shaped uterus were the only injury involved, Narum could have known of it at any time by undergoing a hysterosalpingography, as she ultimately did, and that she *should* have inquired into it in 1985 when she miscarried or learned of her "classic DES cervix," or when she learned in 1975 that she was at a higher risk of infertility from her DES exposure. Narum argues that whether she "should have" known about the T-shaped uterus is a matter of fact, not law. Given the above discussion concerning the injuries that pre-dated Narum's actual knowledge of her T-shaped uterus, the Court need not reach this issue. *But see Goellner v. Butler,* 836 F.2d 426, 432 (8th Cir.1988) (interpreting Minnesota statute-of-limitations law and holding, as a matter of law, that the plaintiff *should have* discovered facts supporting her alleged fraud where the plaintiff claimed an IUD impaired her fertility but where she had received documents warning of possible pelvic infection and infertility). In any event Narum's attorney agreed at oral argument that Narum "had some sense that she had some problems" before her actual knowledge of the T-shaped uterus, but tried to characterize them as "physiological anomalies." Indeed, the injuries Narum admitted at deposition and/or for which she now seeks to recover damages, were "physiological anomalies" that she now, and at their occurrences, blamed on her DES exposure.

■ In her own support Ms. Narum has submitted an Affidavit stating, in part, that it was not until she became aware in 1992 that she had a T-shaped uterus and inability to conceive a child that her "DES exposure did result in an injury." Eli Lilly moves to strike her Affidavit based on the previously noted contradictions to it. While the Court agrees this conclusory statement is contradicted by her own earlier testimony as corroborated by her medical reports, the Affidavit need not be stricken; the Court can give it the weight it deserves in light of her testimony and her prayer for relief. In truth, not all of the Affidavit is directly contradictory to her testimony.

■ On the other hand, the Court cannot so treat Linda Borer's Affidavit. Borer is a paralegal for Narum's attorney, and also a registered nurse. With no other foundation than that, her first Affidavit states that she reviewed certain of Narum's medical records and she makes certain unsupported conclusions and statements clearly beyond her personal knowledge. These include, *"No indication was made* to Mary Jo Hadler [Narum] that she would have problems with conception"; "There was *no mention* of a T-shaped uterus to plaintiff"; *"Dr. Ahrens was unsure* whether or not there were fertility problems ...";* "This information was later related to plaintiff* in a telephone conversation"; "Narum was never told she had ... an injury related to DES until 1992"; "doctors ... did *not know* she had a T-shaped uterus ... until 1992;" "All of plaintiff's pap smears and pelvic examinations were normal"; "prior to 1992 [Narum] did not receive any treatment, nor was she advised to seek treatment other than monitoring ... for any problems or symptoms related to DES exposure." Borer Aff. (emphasis added).

Each of these statements is hearsay, lacks foundation of medical expertise, or is completely without personal knowledge. Nothing in the Affidavit would permit this nurse to testify at trial. Narum argues in response that Borer has "personal knowledge" from her own review of Narum's medical records and from conferring with others. But she certainly has not been qualified to render opinion testimony, even with her assertion in her Supplemental Affidavit that, as a nurse, she has "extensive[ly] review[ed] medical records," or her assertion that her "testimony corroborates the medical records." To the extent her alleged personal knowledge merely restates the medical records, her testimony is cumulative. To the extent her testimony comes from "conferring" with others, her testimony is plain hearsay.

## CONCLUSION

For these reasons the Court concludes it is unnecessary to strike the Affidavit of the Plaintiff herself. However, the Court finds the Affidavit of Linda Borer to be inappropriate and inadmissible. The Court notes that although it strikes the testimony in Bor-

er's Affidavit, the medical records attached to the Affidavit are not stricken. Finally, the Court concludes from the undisputed facts that Ms. Narum's injuries resulting from DES, as alleged by her in her Complaint and her own deposition testimony, and as plainly corroborated by medical reports, accrued at the latest in 1985 when she was informed by her physician that her abnormal cervix was a classic case of DES exposure. Thus, Ms. Narum's claims are barred by even the most lenient statute of limitations applicable here.

Accordingly, **IT IS HEREBY ORDERED THAT:**

1. Eli Lilly's Motion to Strike the Affidavit of Linda Borer (Clerk Doc. No. 26) is GRANTED;

2. Eli Lilly's Motion to Strike the Affidavit of Mary Jo Hadler Narum (Clerk Doc. No. 26) is DENIED; and

3. Eli Lilly's Motion for Summary Judgment (Clerk Doc. No. 22) is GRANTED.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**